# Court of Appeals, State of Michigan

## ORDER

Linda K Heiden v Gerald L Heiden

Docket No. 318245

LC No. 12-001149-DO

Douglas B. Shapiro
Presiding Judge

Elizabeth L. Gleicher

Amy Ronayne Krause
Judges

The Court orders that the February 10, 2015 opinion is hereby VACATED, and a new opinion is attached.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

FEB 2 6 2015
Date

Chief Clerk

LINDA K. HEIDEN,

          Plaintiff-Appellee,

v

GERALD L. HEIDEN,

          Defendant-Appellant.

UNPUBLISHED
February 26, 2015

No. 318245
Ingham Circuit Court
LC No. 12-001149-DO

Before: SHAPIRO, P.J., and GLEICHER and RONAYNE KRAUSE, JJ.

PER CURIAM.

Before their marriage, Linda and Gerald Heiden executed an "antenuptial agreement" describing Gerald's premarital personal injury lawsuit settlement as his separate property. Twenty-four years later, Linda filed for divorce. The circuit court incorrectly ruled that the antenuptial agreement applied only in the event of death, not divorce. The matter then proceeded to mediation moored to this binding, incorrect legal conclusion. As a result, the parties failed to consider during the mediation whether the disputed property belonged to Gerald alone or became part of the marital estate. Absent a resolution of that vital issue, the parties reached a mediation agreement predicated on an inaccurate description of their separate and marital property. Moreover, the property division and spousal support award disparately favored Linda. A judgment was thereafter entered reflecting this misinformed agreement.

We vacate the property division and spousal support award in the divorce judgment and remand to the circuit court to set aside the mediation agreement. On remand, the circuit court must accept that the antenuptial agreement applies to these divorce proceedings. The court must then consider whether the parties subsequently commingled their separate property into the marital estate. Only then can the parties fairly negotiate a settlement on equal footing.

I. BACKGROUND

On October 15, 1987, and in contemplation of marriage, the parties executed a document entitled "Antenuptial Property Agreement." The parties stated "their mutual desire to enter into this agreement whereby they will regulate their relationships toward each other with respect to the property each of them own and in which each of them has an interest." The parties agreed, in relevant part, that "all personal property owned respectively by them shall remain their separate property, no spouse shall have any right in the property of the other spouse, even in the event of the death of either party." The description of Gerald's separate personal property included funds

-1-

held in a trust account. Although the antenuptial agreement did not describe the source of those funds, it is undisputed that they flowed from a settlement in a personal injury lawsuit.

Linda filed for divorce in pro per on April 2, 2012. The complaint described that the parties maintained marital property to be divided. Gerald denied that allegation. Linda further alleged, "Plaintiff is unable to pay the court costs and filing fees of this action. Defendant is able to pay these costs and fees." Gerald denied that allegation as well.

Shortly thereafter, Linda retained counsel and filed a motion seeking to hold Gerald responsible for her legal fees. Linda referred to Gerald's investment accounts, history of real property and securities transactions, and control over the couple's finances and assets. In response, Gerald proffered the antenuptial agreement. Gerald noted that $2,000 of his monthly income was an IRA payout from an account funded by his personal injury settlement. Ordering Gerald to cover Linda's legal fees would force him to invade that separate asset, Gerald contended. When his separate property was removed from the equation, Gerald asserted that "there is very little difference in the party's respective monthly incomes."

Linda then filed a motion for a declaratory judgment that the antenuptial agreement was invalid. She asserted that the parties had "accumulated significant joint assets," including a home, camper, $937 savings account, household furnishings, and "about half a million dollars in assets held by Sigma Financial Corp." Linda contended that the antenuptial agreement was "no longer reflective of the parties['] intent or financial conditions . . . due to unforeseeable change in circumstance" and was "unenforceable" because the parties commingled their separate assets into the marital estate. She suggested that Gerald often invested his personal injury settlement proceeds into real estate projects that the couple tackled "hands on" together. Linda's labor thereby increased the wealth in the accounts Gerald declared separate. If that property were not treated as marital, Linda claimed she would be left financially destitute, a change in circumstances after a long marriage unforeseen when entering the antenuptial agreement.

Gerald retorted that Linda voluntarily entered the antenuptial agreement. The long length of their marriage and the greater accumulation of wealth by one party over the years were not unforeseen circumstances, he averred. Gerald adamantly denied that he ever commingled his separate personal injury settlement:

It is both a profound and willful distortion and mischaracterization to state, as [Linda] does, that [Gerald's] "profits, accounts an[d] proceeds were treated as fungible to the extent they were co-mingled as being joint-marital ventures[.]" . . . From the date of the marriage and thereafter throughout a [24] year marriage, [Gerald] was scrupulous in abiding by the antenuptial agreement by consistently maintaining the singular integrity and autonomy of the separate trust and his investments. The Trust principal was never invaded and its earned interest, which automatically transferred earning into an account held exclusively by [Gerald], was used as income from which to invest in separate investments held exclusively in his sole name.

Throughout the course of the marriage Gerald . . . never once changed his pre-marital financial modus operandi. For [24] years [Linda] knew exactly what

to expect from [Gerald's] financial status. Nothing changed. He supported [Linda] and her relatives but there was absolutely no co-mingling of funds; [Linda] had no access to his accounts, nor was she even added as a joint owner of separate property. Apparently secure in this knowledge that it was money to which he was entitled as a victim of personal injury she never once complained about the benefits to herself and her family as the result of his use of his independent funds.

After conducting an off-the-record, in-chambers conference, the court determined that the antenuptial agreement "does not apply to a divorce action between the parties." "The plain reading" of the agreement, the court continued, "shows that [it] was entered into in the event of the death of either party during the marriage. There is no language in the Agreement that indicates that the property provisions would apply in the event of the divorce of the parties."

One month later, Gerald suddenly proffered evidence supporting that he had not commingled his separate assets into the marital estate. Gerald's financial advisor swore out an affidavit, stating that Gerald had "never added outside funds to" his personal injury accounts and continued to reinvest only "his initial deposit." The financial advisor further avowed that Gerald was the sole account holder and had never asked to add Linda to the account.

On October 24, 2012, the parties attended a mediation session. At the close of the day, they both signed a "mediation agreement." This agreement provided for nonmodifiable spousal support of $2,500 each month in Linda's favor. The payments were to last 10 years and were to cease if Linda died, but not if she remarried. Accordingly, Gerald was liable for $300,000 to Linda in spousal support. Gerald was also required to pay Linda $40,000 "from his pre-marital accident settlement proceeds," increasing his liability to $340,000. Gerald was awarded the parties' marital home, which eventually sold at a loss of $7,400. Linda was awarded the couple's trailer in Florida worth $18,000 (with the exception of a love seat found inside which belonged to Gerald). Linda also retained her pension benefits. The parties agreed to retain their separate debts and any bank accounts held in their own names. The mediation agreement closed by warning the parties that it was a binding contract and would be incorporated in the judgment of divorce.

A little over a month later, represented by a new attorney, Gerald filed a motion to set aside the mediation agreement pursuant to MCR 2.612(C)(1). He contended that his prior counsel coerced him to sign. Gerald noted that he is diabetic and claimed that his blood sugar had dropped so low he could not adequately assess the situation. He accused counsel of badgering and yelling at him, and of not allowing him to read the agreement before signing it. Gerald further asserted that the mediation agreement was unconscionable because the attorneys failed to calculate the value of each party's property after the division, leaving him to pay out more in a month than was available to him.

Linda retorted that the court was bound to enforce the signed mediation agreement. She denied any fraud or mistake leading to the agreement. In relation to any alleged misconduct on

counsel's part, Linda asserted that Gerald could seek redress against him directly, but could not use that as grounds to set aside the signed agreement. Her observations of Gerald on the day of the mediation led her to believe that Gerald was misrepresenting his medical condition.[1]

The court conducted a three-day evidentiary hearing to consider whether Gerald's complaints supported his requested relief. Of import, Gerald's financial advisor Jack Mole, who managed accounts for both parties, testified regarding the parties' financial assets. Mole described that Gerald's assets had a current value of approximately $510,000, including a John Hancock Life Insurance Annuity then valued at $370,691, which contained the proceeds of Gerald's personal injury settlement. "The annuities guarantee a minimum rate of return of six percent," Mole testified, but only if one limits his annual payouts to between 4.5 and 5%. Gerald also maintained approximately $140,000 in IRAs with a return of around 10%. Mole noted that Gerald had recently reduced his monthly withdrawals from $4,000 to $3,300. This reduction was necessary or the account principals would have been depleted within two years. In relation to the $2,500 monthly spousal support award for a 10-year period, Mole testified:

> *Q*. Assuming . . . that [Gerald] were required to pay $2,500 per month for a period of 10 years, and assuming that his only source is his Social Security and these investment accounts, . . . what would you anticipate would happen with respect to the principal balance in the annuities?
>
> *A*. It would be significantly reduced.
>
> *Q*. Okay. If [Gerald] were to also have an income to live on, do you believe that that account would continue for a period of 10 years?
>
> *A*. No.
>
> *Q*. Why not?
>
> *A*. Well, it would be depleted.
>
> *Q*. Okay. Can you explain?
>
> *A*. Well, if we're going to take $30,000 a year out for the $2,500 a month, and then if he required $2,000 a month that's another $24,000, that's $54,000, the account would be depleted fairly rapidly.
>
> *Q*. So it would be impossible for him to pay the alimony for 10 years if that account is gone, is that fair to say?

---

[1] Strangely, Gerald's original attorney refused to withdraw as counsel of record, but also filed a response to Gerald's motion. Counsel denied that Gerald's medical condition impeded his ability to participate in the mediation. He also accused Gerald of obstreperous and dilatory conduct.

*A.* Well, yes. If . . . they're taking principal at that amount, they're going to destroy the guaranteed value because the guarantee will go away. They've taken too much money. Therefore, they would be strictly dependent on market performance, so it just depends on the market. But my guess is that it would be depleted because they're just rapidly . . . I mean, they're taking 10 or 12 percent of principal a year.

\* \* \*

*Q.* And have you seen any market performance that would generate [a] 10 to 12 percent rate of return in the last 10 years?

*A.* No.

*Q.* And . . . as a professional investment advisor, do you see the market in the future being able to have that kind of rate of return?

*A.* Well, I can't predict future performance, but based on past performance, no.

Ultimately, Mole opined that Gerald could safely withdraw an income of $18,500 each year from the John Hancock annuity. He did not identify a figure that could be safely withdrawn from the IRAs.

At the hearing, Gerald and Linda clarified that Gerald had not actually engaged in profit-producing real estate transactions as Linda previously implied. Rather, Gerald used his settlement proceeds to purchase a series of properties upon which he built homes. Both Gerald and Linda participated in the construction process. The couple would then live in the home for five to seven years before selling it and beginning the process anew. Each property had been encumbered by a mortgage, and no sale generated significant profit. Linda also described her monthly financial needs, which hovered around $2,000.

The court subsequently entered a written opinion and order denying Gerald's motion to set aside the mediation agreement. The court rejected Gerald's claims that his low blood sugar on the day of mediation, as well as his attorney's coercive conduct, caused him to sign the agreement against his will and without understanding the terms. The court also rejected that the mediation agreement was substantively unconscionable based on the impossibility of the financial terms. The court ruled, in relevant part:

> [Gerald] then argues that the terms of the settlement leave him financially destitute because he is to pay $2,500/mo of non-modifiable spousal support for 10 years, as well as $1,196.00/mo in mortgage payments, leaving him with $843.00 a month on which to live. [Gerald] currently has an annuity, IRA accounts, and social security which provide his income. Testimony of [Gerald's] financial advisor indicated that the value of [Gerald's] accounts would be substantially reduced if he paid the spousal support outlined in the settlement agreement. The financial chart used by [Gerald] in his closing argument fails to take into consideration the income that would be earned on the IRA and annuity accounts

over the next 10 years which would greatly effect [sic] the remaining principal at the end of the 10 year period. In fact, [Gerald's] John Hancock annuity grew in value from $370,691 on March 31, 2012 to $402,741 as of February 27, 2013, per . . . Jack Mole. In addition, testimony indicates that [Gerald] withdrew $86,449 from 3/31/12 to 3/31/13 from the IRA accounts, which would have a substantial effect on the projected growth over 10 years. [Gerald's] total income from 3/31/12 to 3/31/13 was $105,697 which includes his social security.

Having reviewed the financial information and taking into consideration the amount of income [Gerald] would earn over 10 years on the accounts and considering the amount [Gerald] has withdrawn from the accounts since the complaint for divorce was filed, [Gerald's] situation does not shock the conscience of this Court. [Gerald's] income will undoubtedly be affected by spousal support, but the extent of that effect is not extreme enough and [Gerald] has elected to expend large sums from those accounts for his own purposes.

\* \* \*

[Gerald] argues that payment of the terms of the agreement would leave him very little money at the end of the 10 year period. This may or may not be the case. But, this doesn't constitute original impossibility because it doesn't make performance impossible; it makes performance unwanted. The Court finds this argument somewhat disingenuous considering that [Gerald] received $105,697 from 3/31/12 to 3/31/13. His actions in withdrawing such large sums do not support his concern that he will be financially destitute. [Gerald] argues that the agreement may fall under the definition of supervening impossibility. Testimony from the parties' financial advisor indicates that [Gerald's] financial situation will largely be determined by the interest rate he receives on the accounts. However, regardless of the testimony, [Gerald's] future impossibility does not represent a supervening impossibility because it has not yet developed. Therefore, [Gerald] should not be excused from performance on the basis of impossibility.

This appeal followed.

## II. ANTENUPTIAL AGREEMENT WAS APPLICABLE

The string of errors in these proceedings began when the circuit court misinterpreted the antenuptial agreement, determining that it did not apply in the event of divorce. An antenuptial agreement is a contract and must be interpreted using basic contract principles. See *Reed v Reed*, 265 Mich App 131, 141; 693 NW2d 825 (2005). Of note, the parties entered their agreement in 1984. At that time, prenuptial agreements governing the division of property upon divorce were not recognized in this state. See *id.* at 141-142. Accordingly, the parties could not specifically identify in their antenuptial agreement that they intended for it to apply in the event of divorce. The circuit court used the absence of this language to determine that the contract only applied in

the event one spouse predeceased the other. The circuit court's interpretation does not give effect to the parties' intentions.[2]

> Antenuptial agreements are subject to the rules of construction applicable to contracts in general. Antenuptial agreements, like other written contracts, are matters of agreement by the parties, and the function of the court is to determine what the agreement is and enforce it. . . . [C]ontract terms must be strictly enforced as written, and unambiguous terms must be construed according to their plain and ordinary meaning. . . . [*Id.* at 144-145 (citations omitted).]

Paragraph (1) of the antenuptial agreement states that "[a]ny and all *real property* owned by either party shall remain the separate property of that party, said real property shall not be subject to dower, homestead, or surviving spouse allowance *in the event of the death of either party.*" (Emphasis added.) Reference to the death of a party makes sense in that paragraph. Dower, homestead, and surviving spouse allowances only arise when one party in a marriage dies.

Paragraph (2) states that "[t]he parties further agree that all *personal property* owned respectively by them shall remain their separate property, no spouse shall have any right in the property of the other spouse, *even in the event of the death of either party.*" (Emphasis added.) Contrary to the circuit court's conclusion, this language clearly does not indicate that the separate personal property provision only takes effect in the event of death. In this context, the word "even" is "used as an intensive or emphatic particle . . . emphasizing the limit of what is possible or probable." *Webster's New Universal Unabridged Dictionary* (1983). It suggests that the parties intended to retain as separate their personal property in all events, including death. Divorce was clearly included in the penumbra of events under which the parties would retain their separate personal property. And the court committed clear legal error in ruling to the contrary.

## III. FAILURE TO CHARACTERIZE ASSETS AS MARITAL OR SEPARATE

As a result of the circuit court's erroneous interpretation of the antenuptial agreement, the parties entered mediation negotiations based on a fundamental error. The court's legal error apparently caused the attorneys to forget that an antenuptial agreement is not the only method by which a party's separate property can remain separate. The attorneys thereby compounded the errors by failing to address during mediation whether Gerald's premarital property remained separate or became part of the marital estate.

The income-bearing accounts from which Gerald was required to pay Linda $40,000 and into which Gerald would need to dip to meet his spousal support obligations contained funds that may be treated as separate property even absent an antenuptial agreement. Gerald's accounts

---

[2] In *Reed*, 265 Mich App at 142, this Court upheld a prenuptial agreement upon the divorce of the parties despite that it was executed at a time when "prenuptial agreements in contemplation of divorce were against public policy.

were funded by his personal injury settlement and a lump-sum payout from his pension. It is well established under Michigan law that one spouse's personal injury settlement, meant to recompense that spouse for pain and suffering, is that spouse's separate property. *Washington v Washington*, 283 Mich App 667, 674; 770 NW2d 908 (2009); *Pickering v Pickering*, 268 Mich App 1, 10-11; 706 NW2d 835 (2005); *Bywater v Bywater*, 128 Mich App 396, 398; 340 NW2d 102 (1983). And courts commonly divide pension accounts so that only that portion accrued during the marriage is treated as divisible marital property. See MCL 552.18(1); *Pickering*, 268 Mich App at 8-9; *VanderVeen v VanderVeen*, 229 Mich App 108, 112; 580 NW2d 924 (1998).

Here, the record is clear that Gerald did not personally abandon his struggle to maintain the integrity of his separate property during the long day of mediation negotiations. Perhaps because of Gerald's lack of interpersonal skills,[3] his attorney did. "Generally, the marital estate is divided between the parties, and each party takes away from the marriage that party's own separate estate with no invasion by the other party." *Reeves v Reeves*, 226 Mich App 490, 494; 575 NW2d 1 (1997). Gerald's attorney did not conduct negotiations with this precept in mind. As a result, the parties never resolved whether Gerald's separate property remained separate during the marriage.

There are two statutory exceptions to the rule that a party's separate estate may not be invaded to provide support for the other spouse. *Id.* MCL 552.23(1) permits such invasion based on financial need:

> [I]f the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party . . ., the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

And MCL 552.401 permits invasion of one party's separate assets when the spouse "contributed to the acquisition, improvement, or accumulation of the property." "Moreover, separate assets may lose their character as separate property and transform into marital property if they are commingled with marital assets and 'treated by the parties as marital property.' " *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010), quoting *Pickering*, 268 Mich App at 10-12.

From the record, it appears that these exceptions were not considered during mediation. Accordingly, the division of property was not based on a correct understanding of the value of the marital estate.

---

[3] Both Gerald's doctor and Linda described Gerald as an "angry" person. His testimony at the evidentiary hearing tends to support that assessment.

## IV. MEDIATION AGREEMENT IS FINANCIALLY INEQUITABLE

Even if the entirety of the disputed assets were marital property, the property division and spousal support award were financially unfeasible. "The goal in distributing marital assets in a divorce proceeding is to reach an equitable distribution of property in light of all the circumstances." *Berger v Berger*, 277 Mich App 700, 716-717; 747 NW2d 336 (2008). The award need not be mathematically equal, but it must be equitable. *Sparks v Sparks*, 440 Mich 141, 159; 485 NW2d 893 (1992). "The primary purpose of spousal support is to balance the parties' incomes and needs so that neither party will be impoverished, and spousal support must be based on what is just and reasonable considering the circumstances of the case." *Loutts v Loutts*, 298 Mich App 21, 32; 826 NW2d 152 (2012).

Gerald presented unrebutted evidence from his financial advisor both during mediation and at the circuit court hearing. According to the evidence, Linda received monthly Social Security payments of $1,072 and pension payouts of $895. Adding to her monthly income, Linda was awarded $2,500 in spousal support, for a 10-year total of $300,000 in support. She was awarded $40,000 from Gerald's personal injury settlement, as well as an $18,000 property in Florida. Linda testified, however, that her monthly expenses were only $2,000.

Gerald, on the other hand, receives $1,616 monthly in Social Security benefits. He previously took his pension as a lump sum payment and incorporated those proceeds into his investment portfolio. His annuity and IRA accounts had a combined value at mediation of approximately $510,000. Each account has income-earning capacity, but only if Gerald limits his withdrawals to a certain percentage. At the time of the court's evidentiary hearing, Gerald claimed that he withdrew $2,000 monthly from his various accounts.

The evidence clearly reveals that Gerald's accounts would be depleted long before the 10-year alimony period expired if he were required to withdrawal the amounts necessary to satisfy his debt to Linda as well as to support himself. The $40,000 lump sum award to Linda would reduce his accounts' value to approximately $470,000. As asserted by Mole, Gerald had to limit his monthly withdrawals to between 4.5 and 5% to ensure that the account continued to earn income and maintain a stable balance. According to our calculations, Gerald therefore had to limit his annual withdrawals to $23,500, or just under $2,000 each month. Gerald complied with that calculation by reducing his payouts. This left Gerald with $3,616 in monthly income, or $1,116 to cover his monthly living expenses after paying Linda's spousal support. Linda's monthly income after spousal support would be $4,467, more than four times Gerald's available income. This result clearly was not equal, nor equitable, and was not necessary to meet Linda's $2,000 monthly expenses.

## V. MOTION TO SET ASIDE MEDIATION AWARD

Once Gerald secured new counsel who recognized the errors committed by the circuit court and his prior attorney, Gerald sought to set aside the mediation agreement. The circuit court abused its discretion, see *Rose v Rose*, 289 Mich App 45, 49; 795 NW2d 611 (2010), in denying Gerald's motion for relief. The court's legal error was "so substantial that, but for the error, the award would have been substantially different." *Cipriano v Cipriano*, 289 Mich App 361, 368; 808 NW2d 230 (2010).

Gerald signed a settlement following mediation. The settlement provided that it "is a final and binding contract" and would be reduced to a court judgment. It is well settled under Michigan law that a party is bound by the terms of a settlement agreement to which he affixes his signature. However, it is equally well established that a party may avoid a settlement contract when agreement was secured by fraud, duress, or mutual mistake. *Vittiglio v Vittiglio*, 297 Mich App 391, 400; 824 NW2d 591 (2012); *Keyser v Keyser*, 182 Mich App 268, 269-270; 451 NW2d 587 (1990); *Kline v Kline*, 92 Mich App 62, 71; 284 NW2d 488 (1979). We discern such grounds for relief in this case.

The circuit court committed clear legal error by misinterpreting the antenuptial agreement. The parties' premarital contract applies in their divorce proceedings. It clearly reflects the parties' intention to maintain as separate their personal property. The court's error affects the sum and substance of the mediation agreement—the property division and spousal support award.

In granting appellate relief, we find instructive the law governing binding domestic-relations alternative dispute resolution (ADR) in Michigan. Just as provided in the current mediation agreement, resolutions following ADR are binding and can even "defeat an otherwise valid claim" on the part of a challenging party. *Cipriano*, 289 Mich App at 367. Even under the ADR statutory strictures, a court must grant relief in certain circumstances, such as where the agreement was procured by " 'corruption, fraud, or other undue means.' " *Id.*, quoting MCL 600.5081. As noted in *Cipriano*, 289 Mich App at 368: "In order for a court to vacate an arbitration award because of an error of law, the error must have been so substantial that, but for the error, the award would have been substantially different." See also *Washington*, 283 Mich App at 672 (holding that arbitrators exceed their powers when they enter an award "in contravention of controlling principles of law").

Had this case proceeded to statutory ADR, relief would certainly be warranted based on the circuit court's preceding legal error. Common-law mediation proceedings are generally more lenient that legislatively created ADR. Accordingly, relief must be equally available in this case. The circuit court's clear legal error affected the description of the marital estate. The error affected the integrity and fairness of the mediation negotiations. Over Gerald's objections, the parties proceeded without dividing their property into separate and marital assets. The attorneys then essentially ignored the advice of the parties' financial advisor and reached a disparate award.

We therefore vacate the mediation agreement and the property division and spousal support provisions of the divorce judgment entered therefrom. This does not end the parties' disputes, however. On remand, the court will be required to categorize the parties' various assets as marital or separate as described in Section III. The court then must divine an equitable distribution of the assets as outlined in Section IV. Only then may a valid judgment of divorce be entered.

We vacate the mediation agreement and, in part, the judgment of divorce and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher
/s/ Amy Ronayne Krause